### Commonwealth vs. Scott Deschaine.

No. 07-P-791.

Hampden. October 13, 2009. - August 30, 2010.

Present: Kafker, Katzmann, & Rubin, JJ.

*Assault and Battery on Correctional Officer. Practice, Criminal,* New trial, Assistance of counsel, Psychiatric examination. *Intent.*

There was no abuse of discretion in a judge's denial of a criminal defendant's motion for a new trial (or in the denial of the defendant's related motions for an evidentiary hearing and for funds to obtain a psychiatric evaluation), on grounds that trial counsel was ineffective in failing to introduce expert testimony that the defendant suffered from intermittent explosive disorder (IED) and therefore could not form the specific intent required to commit the crime charged, where, given that the crime charged — assault and battery on a correction officer — requires the Commonwealth to prove the defendant knew the person he struck was a correction officer, the psychiatrist's affidavit contained in the record did not suffice to raise a substantial issue whether the defendant's IED affected his knowledge or capacity to know that he was assaulting a correction officer; thus, the record did not establish that the defendant raised a substantial issue warranting an evidentiary hearing, or that he was deprived of a substantial avenue of defense. [512-517]

INDICTMENT found and returned in the Superior Court Department on July 21, 2005.

The case was tried before *C. Brian McDonald,* J., and a motion for a new trial, filed on October 22, 2007, was heard by him.

*Elaine Fronhofer* for the defendant.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

KATZMANN, J. The defendant, Scott Deschaine, was convicted by a Superior Court jury of assault and battery upon a correction officer, in violation of G. L. c. 127, § 38B. Claiming principally that his trial attorney should have introduced

psychiatric evidence, he now appeals his conviction, as well as the denial of his motions for a new trial and an evidentiary hearing, and his motion to obtain funds for a psychiatric evaluation. We affirm.

*Background.* The evidence at trial, presented through the testimony of two correction officers,[1] showed the following. On April 12, 2005, the defendant was an inmate at the Hampden County house of correction (house of correction). On that day, he was waiting in a hallway of the house of correction to visit with his attorney. There were a number of people in the area (where inmates met with their attorneys and also took educational programs), including staff of the house of correction, inmates, and teachers. The defendant grew agitated and complained loudly to correction officer Enrique Chavez (who was stationed in the area) that he needed to see his attorney right away. According to Officer Chavez, the defendant "was upset about something" and said, "I need to get in there right now to see him." Officer Chavez told him to "[h]ave a seat" because it was a "very busy time of the day, and as soon they call his name, he'll go in." The defendant sat down but continued saying, "I need to get in there right away." He then "started saying things like, 'Fuck that. I need to see the attorney right now. I need to get the fuck in there now.' " The defendant, who remained sitting, kept repeating this statement and "kept yapping." After five minutes, Officer Chavez told him that "he needed to relax or he was going back to his pod [the unit where he lived]." The defendant responded, "Fuck that. I'm not going anywhere. I'm going to stay right here." Officer Chavez then said, "You know what, just return to your pod right now. Cool off and come back later when you're cooled off." The defendant answered, "I'm not going anywhere. Fuck that." Officer Chavez's supervisor, Lieutenant David Alvarado, came over and Officer Chavez explained the situation. Lieutenant Alvarado then "took over" and told the defendant, who was sitting, "that he need[ed] to listen" to orders given by a correction officer. The defendant, who was "angry already at that time," said, "I need to get the fuck in there. I came here . . . to see the attorney, so I'm going to stay here until I see him." Lieutenant

---

[1] The defendant did not testify.

Alvarado asked the defendant for his name a couple of times, and he did not respond. Then "just out of nowhere, [the defendant] said, 'If we get out of here, let's get the fuck out of here.' " He then got up from his seat and began to walk away, but Lieutenant Alvarado told him to stop and put his arm up to stop him. At this point, the videotape shows the defendant was surrounded by two correction officers in blue uniforms, and Lieutenant Alvarado (in a white shirt). Lieutenant Alvarado ordered the defendant to stand facing the wall with his hands behind his back. At first he complied. Then suddenly, just as Lieutenant Alvarado attempted to place handcuffs on his wrists, the defendant swung around and "just went after" Lieutenant Alvarado. Lieutenant Alvarado testified that the defendant tried to punch and attack him. The video recording (without audio) shows that although he appeared to be compliant initially when Lieutenant Alvarado placed the first handcuff on him, the defendant, who was facing a wall, swung around and pushed him, throwing a punch. Other officers joined the scuffle and took down the defendant, who continued to struggle, grab and throw punches. The jury, who viewed the video a number of times, could have found that Lieutenant Alvarado was bruised from being pushed into the wall and was scratched by the defendant in the subsequent struggle on the floor.

During their deliberations, the jurors sent a number of notes to the judge seeking clarification regarding the assault and battery charge. First the jurors asked whether they had to find that the defendant's intent was to assault and batter a correction officer generally or Lieutenant Alvarado specifically. Counsel and the trial judge discussed this question, and the judge instructed the jury: "[T]he Commonwealth must prove beyond a reasonable doubt that Mr. Deschaine intended to touch Lieutenant Alvarado; that is, that he touched Lieutenant Alvarado, however slight, and that the touch was intentional, not accidental."

In another note, the jury asked the judge: "In order to find the defendant guilty *or* not guilty must we determine that the defendant intentionally singled out [Lieutenant] Alvarado to [assault and batter] or is an [assault and battery] against any of the [correction officers] (which happened to be [Lieutenant] Alvarado) grounds [for our decision]?" (Emphasis original.) A discussion between counsel and the judge followed, during which the prosecutor

argued that assault and battery is a general intent crime and the defense counsel did not contradict him. The judge instructed without objection:

> "Assault and battery on a correction officer is a general intent crime. The Commonwealth does not need to prove that Mr. Deschaine singled out Lieutenant Alvarado or specifically intended to commit a battery on Lieutenant Alvarado. The Commonwealth must prove that Mr. Deschaine touched Lieutenant Alvarado intentionally; that is, not accidentally, and that at that time Mr. Deschaine knew Lieutenant Alvarado was a correctional officer."

In their final note, the jury requested those instructions from the judge in writing; they were provided to the jury after both counsel agreed. A verdict of guilty was then returned.

In a motion for a new trial filed in October, 2007, the defendant alleged that trial counsel was ineffective in failing to understand the essential elements of assault and battery on a correction officer and, consequently, failing to introduce psychiatric evidence relevant to those elements. The premise of the defendant's motion was that assault and battery on a correction officer is a specific intent crime, and the defendant's intermittent explosive disorder (IED) may have rendered him incapable of forming the specific intent to touch a correction officer. Therefore, his argument went, counsel should have obtained psychiatric evidence to present to the jury, and her failure to do so deprived him of a substantial ground of defense. Along with the new trial motion, the defendant requested an evidentiary hearing and filed a related motion for funds to obtain a psychiatric evaluation.

Several affidavits were submitted in support of the defendant's motion for a new trial. The defendant's appellate attorney submitted an affidavit, as did psychiatrists Dr. Tedd H. Ackerman and Dr. Emad H. Eskander, who worked with the defendant, and the defendant himself.

Dr. Ackerman averred in his affidavit of October 2, 2007, that he treated the defendant at the house of correction in April, 2005, shortly before the altercation. In his report of May 17, 2005, which was submitted with his affidavit, Dr. Ackerman stated that the defendant "had been on the [Evaluation and

Stabilization Unit] earlier in the year secondary to thoughts of suicide and he was quite agitated at that time. There is a history of significant violence towards others and a history of significant suicide attempts. He has a history of poor response to incarceration in the past." Dr. Ackerman further stated, "The patient appears to have intermittent explosive symptoms. Risperdal should be helpful." Noting that he was responding to counsel's question whether the defendant's mental illness could have affected his ability to have formed a specific intent to assault Lieutenant Alvarado, Dr. Ackerman wrote:

> "I explained that, while I did not remember Mr. Deschaine, I noted that the treatment record I had been sent indicated a diagnosis of Intermittent Explosive Disorder. I told [new defense counsel] that a person with that disorder would react without thinking and that Mr. Deschaine's mental illness definitely could have affected his ability to form the intent to assault any one person. In order to fully assess Mr. Deschaine's condition and its impact on the incident, I would need to evaluate all of the records."

The defendant also submitted an August 15, 2007, electronic mail message (email) from his trial counsel in response to his new counsel:

> "As I recall, I did investigate Mr. Deschaine's mental health claims as they related to his case. . . . Also, I recall that Mr. Deschaine directed me to contact a doctor that he was seeing prior to his incarceration. I contacted and spoke with said doctor [Dr. Eskander] and again, determined from the conversation, that there was nothing remarkable or rising to the level of a defense that would have been appropriately before a jury. My impression at the time was that Mr. Deschaine was trying to find something other than himself on which to blame his behavior. *My understanding of the law is that mental health issues are relevant at trial if they go either to lack of criminal responsibility or competency to stand trial. Otherwise, it is my opinion that mental health issues and the taking of certain types of medication are issues to be raised at sentencing, in mitigation.* In my opinion, this was done as Mr. Deschaine informed the court of his mental

health issues prior to trial and the judge allowed for a mental health evaluation by the court clinic and the court had the benefit of said report at that time of trial and sentencing." (Emphasis added.)

In his affidavit of October 15, 2007, Dr. Eskander, who confirmed that he had been contacted by trial counsel on April 4, 2006, indicated that he had seen the defendant on two occasions in the past three years, and referred to a note he dictated on April 4. In that note, Dr. Eskander stated that defense counsel had "asked a few questions about and discussed mainly [the defendant's] medications, current and past. . . . I explained . . . that . . . to my knowledge, the medications that he was prescribed [during his incarceration] are mostly sedating in nature." Neither the affidavit nor the note reflects any questioning regarding the defendant's capacity to form an intent to commit the charged crime. The new trial motion also included Dr. Eskander's "Initial Psychiatric Evaluation," dated March 7, 2006, indicating that the defendant had "a long-standing history of mood instability, [and] impulse control problems resulting in recurrent assaults and arrests."

The defendant also submitted an affidavit, stating that he had advised his trial counsel that he could not remember most of the events relating to the charge, that he had informed counsel that he had a history of psychiatric treatment, that he thought his psychiatric situation might explain his lack of recall, and that a psychiatric evaluation would have some bearing on his defense.

After considering the affidavits and legal memoranda, the judge denied the motion for a new trial. He determined that the central premise — that assault and battery on a correction officer is a specific intent crime — was erroneous. Therefore, there was "no merit to the defendant's claim that his trial counsel rendered ineffective assistance by not advancing a mental impairment defense premised on the incorrect theory that assault and battery on a correction officer is a specific intent crime." Since the motion for funds was based on the same premise that the judge deemed faulty, the judge denied that motion. The motion for an evidentiary hearing was denied because the motion and affidavits did not raise a substantial issue.

*Discussion.* Rule 30(b) of the Massachusetts Rules of Criminal Procedure, as amended, 435 Mass. 1501 (2001), provides that a motion for a new trial may be allowed "at any time if it appears that justice may not have been done." "Generally, appellate courts give 'great deference' to the judge's disposition of a rule 30 motion, 'especially when he or she was the trial judge,' " as here. *Commonwealth* v. *Pagels*, 69 Mass. App. Ct. 607, 615 (2007), quoting from *Commonwealth* v. *Delacruz*, 61 Mass. App. Ct. 445, 450 (2004). "A defendant's submissions in support of a motion for a new trial need not prove the factual premise of that motion, but they must contain sufficient credible information to 'cast doubt on' the issue. A judge may also consider whether holding a hearing will add anything to the information that has been presented in the motion and affidavits." (Citations omitted). *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348 (2004). "The judge may rule on a motion for a new trial without an evidentiary hearing where the motion and supporting materials do not raise a 'substantial issue.' " *Commonwealth* v. *Denis*, 442 Mass. 617, 628 (2004). In evaluating this decision, we consider "both the seriousness of the issue itself and the adequacy of the defendant's showing on that issue." *Ibid.* The reviewing court examines the denial of a motion for a new trial to determine whether the motion judge has committed a significant error of law or an abuse of discretion. *Commonwealth* v. *Grace*, 397 Mass. 303, 307 (1986). We may reverse only if "no conscientious judge, acting intelligently, could honestly have taken the view expressed by [the judge]." *Commonwealth* v. *Clemente*, 452 Mass. 295, 304 (2008), cert. denied, 129 S.Ct. 1329 (2009), quoting from *Commonwealth* v. *Candelario*, 446 Mass. 847, 858 (2006).

A new trial motion can be based upon a claim of ineffective assistance of counsel. *Commonwealth* v. *Saferian*, 366 Mass. 89, 97 (1974). The defendant argues that his trial counsel rendered ineffective assistance by failing to understand the intent element of assault and battery upon a correction officer, and failing to procure an expert to testify that he suffers from IED and therefore could not form the intent to commit the crime. Such a claim requires not only that he demonstrate that even an "ordinary fallible lawyer" would have presented such

a defense, but also that it would have provided a "substantial ground" for success. *Saferian, supra* at 96.

A. *General intent and specific intent.* The statute setting forth assault and battery of a correction officer, G. L. c. 127, § 38B, does not explicitly state whether the requisite intent is general or specific.[2] Although the parties frame the principal question in terms of whether assault and battery on a correction officer is a "general intent" or "specific intent" crime, such categorizations can obscure more than they illuminate. It has been long recognized that "[t]he 'venerable distinction' at common law between general intent and specific intent 'has been the source of a good deal of confusion.' " *Commonwealth* v. *Gunter,* 427 Mass. 259, 268 (1998), quoting from *United States* v. *Bailey,* 444 U.S. 394, 403 (1980), citing LaFave & Scott, Criminal Law § 28, at 201-202 (1972).

The Supreme Judicial Court wrote:

> "Commenting on the relationship between the traditional common-law dichotomy between general and specific intent and the alternative analysis of mens rea in the Model Penal Code, the Supreme Court explained that '[i]n a general sense, "purpose" corresponds loosely with the common-law concept of specific intent, while "knowledge" corresponds loosely with the concept of general intent.' *Bailey, supra* at 405, citing [LaFave & Scott], *supra.* We do not think it necessary that a judge use the common-law terms, general intent and specific intent, provided that he explains to the jury the Commonwealth's burden on the specific intent element in a charged offense . . . — that a defendant must not only have consciously intended to take certain actions, but that he also consciously intended certain consequences . . . to result from his actions." (Footnote omitted.)

*Gunter, supra* at 268-269.

---

[2]That statute, in relevant part, states: "A prisoner in any jail or house of correction, or in any correctional institution of the commonwealth who commits an assault or an assault and battery upon an officer, guard or other employee of any jail, house of correction or correction institution . . . shall be punished by imprisonment in the state prison for not more than ten years." G. L. c. 127, § 38B, as amended by St. 1992, c. 323.

B. *Assault and battery upon a correction officer and intermittent explosive disorder.* With respect to assault and battery, the notions of specific and general intent arise when the question is whether it is required that the defendant had the specific intent to injure. See, e.g., *Commonwealth* v. *Cabral,* 46 Mass. App. Ct. 917, 918 (1999) ("Because assault and battery by means of a dangerous weapon is a general intent crime, *there is no requirement that the Commonwealth must prove the defendant had a specific intent to injure the victim*") (emphasis original), quoting from *Commonwealth* v. *Ford,* 424 Mass. 709, 711 (1997). While assault and battery is considered a typical general intent crime not requiring a specific intent to injure, *Ford, supra* at 711, assault and battery upon a person of a certain type requires that the defendant *know that the other is of a certain type.*[3] See, e.g., *Commonwealth* v. *Thomas,* 401 Mass. 109, 118 (1987) (conviction of indecent assault and battery on mentally retarded person required knowledge that victim was mentally retarded); *Commonwealth* v. *Moore,* 36 Mass. App. Ct. 455, 461 (1994) (crime of assault and battery on police officer requires proof that defendant knew victim was a police officer engaged in performance of his duties). See also *United States* v. *Santos,* 363 F.3d 19, 23 (1st Cir. 2004), cert. denied, 544 U.S. 923

---

[3]The defendant argues that the judge erred in instructing the jury as follows:

"Assault and battery on a correction officer is a general intent crime. The Commonwealth does not need to prove that Mr. Deschaine singled out Lieutenant Alvarado or specifically intended to commit a battery on Lieutenant Alvarado. The Commonwealth must prove that Mr. Deschaine touched Lieutenant Alvarado intentionally; that is, not accidentally, and that at that time Mr. Deschaine knew Lieutenant Alvarado was a correction officer."

The defendant did not object to the judge's instructions at trial and thus did not preserve this issue for review. Therefore, we review this issue to determine whether there was an error resulting in a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967); *Commonwealth* v. *Delaney,* 425 Mass. 587, 595-596 (1997), cert. denied, 522 U.S. 1058 (1998). The standard is whether "there is substantial danger that the jury were misled by the erroneous instruction, and that the instruction may have materially influenced their" decision. *Freeman, supra* at 564. There was no such risk created here. Indeed, because we conclude that assault and battery upon a correction officer requires a showing that the defendant knows the person he struck was such an officer, we also conclude that the instruction was correct.

Commonwealth *v.* Deschaine.

(2005), quoting from *United States* v. *Fernandez*, 121 F.3d 777, 778 (1st Cir. 1997) ("At a minimum, assault and battery upon a police officer requires purposeful and unwelcomed contact with a person the defendant knows to be a law enforcement officer actually engaged in the performance of official duties"). In short, only a general intent to commit an assault and battery coupled with knowledge of the correction officer's status is required. See *Commonwealth* v. *Francis*, 24 Mass. App. Ct. 576, 581 (1987). To characterize assault and battery on a correction officer as a "specific intent" crime confuses the requisite element that the defendant know the status of the officer on whom he commits an intentional assault and battery with the concept that he intended the consequences of his action.

Here, in order to convict the defendant of assault and battery on a correction officer, the Commonwealth was required at trial to prove the defendant knew that the person he struck was a correction officer. The question is thus whether evidence regarding IED is relevant to the defendant's knowledge of the status of the correction officer. IED is an "impulse control disorder" whose existence has been noted in decisions of the Supreme Judicial Court. See, e.g., *Commonwealth* v. *James*, 427 Mass. 312, 315-316 (1998); *Commonwealth* v. *Means*, 454 Mass. 81, 99 n.26 (2009). See also *Commonwealth* v. *Groome*, 435 Mass. 201, 221 n.28 (2001); *Commonwealth* v. *Rasmusen*, 444 Mass. 657, 661 (2005); *Commonwealth* v. *Mercado*, 452 Mass. 662, 670 n.13 (2008); *Commonwealth* v. *Druce*, 453 Mass. 686, 692 (2009). The disorder is included in the larger family of axis I impulse control disorders listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (DSM-IV),[4] together with kleptomania, pyromania, pathological gambling, and trichotillomania. As explained in the DSM-IV at 663-664,

"The essential feature of Intermittent Explosive Disorder

---

[4]In taking judicial notice of the DSM-IV, we do so with the caution that "[t]he DSM-IV itself cautions against the use of its diagnostic criteria and descriptions by individuals who are not clinically trained or for purposes other than diagnosis" (footnote omitted). *Doe, Sex Offender Registry Bd. No. 89230* v. *Sex Offender Registry Bd.*, 452 Mass. 764, 776 n.20 (2008) (quoting DSM-IV preface).

is the occurrence of discrete episodes of failure to resist aggressive impulses that result in serious assaultive acts or destruction of property . . . . The degree of aggressiveness expressed during an episode is grossly out of proportion to any provocation or precipitating psychosocial stressor. . . . A diagnosis of Intermittent Explosive Disorder is made only after other mental disorders that might account for episodes of aggressive behavior have been ruled out (e.g., Antisocial Personality Disorder, Borderline Personality Disorder, a Psychotic Disorder, a Manic Episode, Conduct Disorder, or Attention-Deficit/ Hyperactivity Disorder). . . . The aggressive episodes are not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication) or a general medical condition (e.g., head trauma, Alzheimer's disease)."

See *James, supra* at 315-316 (IED "is characterized by inability to control aggressive impulses, reactions out of proportion to provocative stimuli, and discrete aggressive episodes of short duration"); *Means, supra* at 99 n.26 (quoting from DSM-IV).

Evidence of IED may be relevant in murder cases as it could impair the defendant's "capacity to premeditate, to act with extreme cruelty, or to act with malice." *James, supra* at 316. Evidence that a defendant suffers from IED may also be relevant to the defense of lack of criminal responsibility, i.e., whether he had the capacity to conform his behavior to requirements of the law. See, e.g., *Commonwealth* v. *Rasmusen, supra* at 661-663 (although defense rejected by jury, IED and other mental disorder evidence allowed in evidence to prove lack of criminal responsibility); *Druce, supra* at 692, 705-706 (same). See also *Means, supra* at 99 & n.26 (where mental competence to waive counsel was in issue, IED and other mental disorder evidence relevant on question whether the defendant "suffered from a mental illness that impaired his ability to control his actions").

In Massachusetts, however, no cases address the issue whether, with respect to the offense of assault and battery on a correction officer, IED may be relevant to the defendant's *knowledge* of the status of the officer. Compare *Commonwealth* v. *Gaboriault,* 439 Mass. 84, 92 & n.12 (2003) (with respect to proof of malice

in murder in the first and second degree, "a defendant's mental impairment is relevant to intent *and* knowledge") (emphasis in original). Nor do any of the cases indicate that besides being a behavioral or impulse control disorder, IED also amounts to a perceptual disorder[5] such that it would have bearing on the defendant's awareness or knowledge that Lieutenant Alvarado was a correction officer. Dr. Ackerman's bare-bones affidavit states that individuals with IED "react without thinking" and IED "could have affected [the defendant's] ability to form the intent to assault any one person." The affidavit thus refers to IED as a disorder that could affect the defendant's intent, but we do not read it to speak to whether IED affected the defendant's knowledge or his capacity to know with whom he was engaging. Therefore, the affidavit does not suffice to raise a substantial issue whether the defendant, who engaged in an escalating argument and altercation with uniformed correction officers in a correction facility, knew he was assaulting a correction officer. On the record before us we conclude that the defendant has not raised a substantial issue warranting an evidentiary hearing, or shown that he was deprived of a substantial avenue of defense. There was therefore no abuse of discretion in the judge's denial of the motions for an evidentiary hearing and new trial. See *Commonwealth* v. *Denis*, 442 Mass. at 628; *Commonwealth* v. *Clemente*, 452 Mass. at 304. It follows, too, that the judge did not abuse his discretion in denying the motion to obtain funds for a psychiatric examination. See *Commonwealth* v. *Dubois*, 451 Mass. 20, 33 (2008).

*Judgment affirmed.*

*Orders denying motions for evidentiary hearing, new trial, and funds affirmed.*

---

[5]See, e.g., *Commonwealth* v. *Whitman*, 453 Mass. 331, 338 n.8 (2009) ("schizotypal personality disorder . . . can involve unusual perceptual experiences, odd beliefs or bizarre fantasies, a constricted range of affect, and a lack of close friends outside of the family"). See also *United States* v. *Rahm*, 993 F.2d 1405, 1414 (9th Cir. 1993) ("evidence that [the defendant] suffered from impaired perceptual ability would be highly probative as to the existence or absence of guilty knowledge").